UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MARIA STANG,

　　　　Plaintiff,

v.

DELTA AIRLINES, INC.,

　　　　Defendant.

Case No. 18-13112
Honorable Laurie J. Michelson

## OPINION AND ORDER
## GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [33]

Maria Stang is a flight attendant for Delta Airlines, Inc. and believes that Delta violated the Family Medical Leave Act. In September 2015, Stang was slated to work a flight from Detroit, Michigan to Rome, Italy. Stang was not feeling well that day but thought that she could still handle the Rome flight. But shortly before that flight's departure, Stang was drafted to be the lead flight attendant (or, more precisely, the "purser") on a flight from Detroit to Amsterdam. Stang told Delta that she was refusing the draft on account of illness. This resulted in Delta disciplining Stang. Stang believes that by disciplining her, Delta interfered with her right to take leave under the Family Medical Leave Act and retaliated against her for taking leave under the FMLA. So she filed this suit against Delta.

Delta now seeks summary judgment. The Court has reviewed the summary-judgment record and finds that Stang does not have evidence that would allow a reasonable jury to find that Delta retaliated against her because she exercised rights under the FMLA. And in response to Delta's motion, Stang has withdrawn her interference claim. So Delta's motion will be granted.

# I.

## A.

To understand this case, it is helpful to know a bit about Stang's employment history and the position of "purser."

Stang has been a flight attendant for over 30 years. She started with Republic and then worked for Northwest after the two companies merged. (ECF No. 33-2, PageID.270.) In 2008, Northwest and Delta merged, and Stang has worked for Delta ever since. (ECF No. 33-2, PageID.266, 270–271.) Stang has a history of strong performance and has never received any formal discipline. (*See* ECF No. 33-20, PageID.637; ECF No. 33-2, PageID.381.)

Around 2012, Stang completed training to serve as a "purser." (ECF No. 33-5, PageID.447; ECF No. 33-2, PageID.272.) To oversimplify a bit, a purser is the head flight attendant on international flights and is "responsible for the entire aircraft underneath the cockpit crew." (ECF No. 33-2, PageID.274; *see also* ECF No. 33-6, PageID.465–466.) The parties disagree as to how similar a purser is to a flight attendant. In Delta's view, if a person is healthy enough to work as a flight attendant, she is healthy enough to work as a purser. (ECF No. 33-6, PageID.464–465, 497.) Stang disagrees. In her view, a purser is considerably different from a flight attendant, and, at the least, the purser job is more mentally demanding. (ECF No. 33-2, PageID.274, 364, 371.) Aside from the fact that it is Stang's account that matters on summary judgment, her account has some corroboration: Delta's "On-Board Manual" provides additional duties for pursers, and Delta pays pursers $5 more per hour than flight attendants. (ECF No. 33-7, PageID.521–535; ECF No. 33-2, PageID.278.)

Stang's employment history indicates that in the years leading up to the events of this case, she did not work a lot of hours as a purser. Stang worked about 150 hours as purser in 2014 and about 38 hours during the eight months of 2015. (ECF No. 33-4, PageID.444.)

**B.**

With that, the Court turns to the events giving rise to this case.

**1.**

On September 12, 2015, Stang and other Delta employees attended a wedding in Michigan. Among the Delta employees that attended were Stang's friends, Sherry Lee Benda and Amy Berichon. (ECF No. 33-2, PageID.312–313.) Stang, Benda, and Berichon (and others at the wedding) were slated to work a flight from Detroit, Michigan to Rome, Italy the next day, September 13. (ECF No. 33-2, PageID.313–314.)

On that day, Stang began to feel sick. As Stang and Benda were driving to the Detroit airport, Stang "started not feeling right." (ECF No. 33-2, PageID.317, 322.) Stang arrived at the airport a few hours before the Rome flight and went to a Delta employee lounge. (*See* ECF No. 33-2, PageID.315; ECF No. 33-14, PageID.621.) Stang recalls that as she was waiting in the lounge, "I . . . started developing welts on my face, I was getting very itchy, my throat was starting to get scratchy." (ECF No. 33-2, PageID.323.) Stang told Benda and other friends who were slated for the Rome flight that she was not feeling well. (ECF No. 33-2, PageID.322.) But Stang's friends assured her that they would take care of her on the flight. (ECF No. 33-2, PageID.325.)

The Rome flight was set to depart around 6:00 p.m. and as it turned out, another Delta flight—from Detroit to Amsterdam—was also departing around that time. (*See* ECF No. 33-14, PageID.621.) And due to a shortage of pursers, the Amsterdam flight did not have one. (*See* ECF No. 33-14, PageID.621.) Initially, Berichon was "drafted" to fill the purser position for the

Amsterdam flight. (ECF No. 33-2, PageID.323; ECF No. 33-14, PageID.621.) But Berichon was also sick and thus refused to accept the draft. (ECF No. 33-14, PageID.621.) So Delta then drafted Stang to be the purser on the Amsterdam flight. (ECF No. 33-25, PageID.744.) Although Delta's scheduling department paged Stang at least once while she was in the lounge, Stang did not hear the page. (ECF No. 33-12, PageID.614–615; *see also* ECF No. 33-2, PageID.318–319.)

So about 90 minutes before the Rome flight was set to depart, Stang headed to the briefing room for that flight. (*See* ECF No. 33-2, PageID.294, 318.) A Delta manager was able to locate Stang there and told her that she had been drafted for the purser position on the Amsterdam flight. (ECF No. 33-2, PageID.349–350.) Stang informed the manager that she could not accept the draft because she was sick. (*See* ECF No. 33-2, PageID.355; ECF No. 33-12, PageID.614.) Around this time, Delta's scheduling department had called Stang on a phone in the lounge. (ECF No. 33-2, PageID.381.) Stang took the call and informed the scheduling person that she was sick and would not accept the draft. (ECF No. 34, Audio Recording.) The scheduler indicated that because Stang's notice was within three hours of her report time, he would have to read her the "trip refusal script." (Recording at 00:30.) As part of that script, Stang was advised that she was being coded with a "CFSM" (i.e., contact flight service manager), that the flight service manager would review the circumstances surrounding Stang's decision to not fly, and that if the decision was deemed a "trip refusal," she would be subject to performance development. (*Id.* at 02:00 to 02:30.) Stang had never been given a CFSM before. (ECF No. 33-2, PageID.330–331.) In the end, Stang did not take the Amsterdam flight and instead flew back home to Minnesota. (ECF No. 33-2, PageID.335.)

**2.**

The next day, Stang contacted her flight service manager and her direct supervisor, Christian Gunn. (ECF No. 33-2, PageID.408; ECF No. 33-16, PageID.626.) Gunn informed Stang

4

that she was under investigation for a trip refusal because she called in sick after she was drafted to the Amsterdam flight. (ECF No. 33-16, PageID.626.)

As part of Gunn's investigation, he asked Stang to provide a written statement. (*Id.*) In her statement, Stang explained, "In retrospect, I should not have come to work September 13, 2015 d[ue] to illness. Being drafted to the leadership role, I felt that I could not perform the duties of being Purser to the standards expected by Delta Airlines. I was ill and should . . . have made the decision to have called off the trip." (ECF No. 33, PageID.626.) Stang continued, "I had my Doctor appointment today and he has grounded me until Thursday September 17, 2015 due to my illness. My 30 year record speaks for itself, I am reliable, dedicated and professional flight attendant. Unfortunately, in this case my judgement was blurred." (*Id.*)

Delta—or more precisely, Delta's claims handler—eventually found that Stang's absence from the Amsterdam flight was covered by the Family Medical Leave Act. In particular, three days after the flight (September 16), Gunn advised Stang to contact Sedgwick Claims Management Services, the company that handled FMLA requests for Delta. (ECF No. 33-18, PageID.632; ECF No. 33-20, PageID.636.) Then, on September 24, Stang's physician faxed a FMLA medical certification form to Sedgwick. (ECF No. 33-22, PageID.643–646.) And in a letter dated September 28, 2015, Sedgwick informed Stang that she had been approved for FMLA leave from September 12, 2015 (the day before the flight) to September 17, 2015. (ECF No. 33-21, PageID.639.)

Meanwhile, Gunn was completing his investigation. And on September 22—about a week before Sedgwick's FMLA approval letter—Gunn sent a memo to Susan McGlone, a base manager for Delta. (*See* ECF No. 33-20.) Gunn wrote, "Maria [Stang] was more concerned about being [drafted] than her illness. She attempted to get the scheduler to have another flight attendant cover

rotation. She was in briefing [for the Rome flight] preparing to sign up for a working position on [that] flight. In Maria's statement she states she wasn't 'physically, mentally, or capable of performing the role of a purser.'" (ECF No. 33-20, PageID.636.) In formulating his performance-development recommendation, Gunn wrote, "Maria recently celebrated her 30th anniversary with Delta Air Lines in July. A look back at her record shows she hasn't had any formal discipl[ine] during her tenure. Every month her purser statement proves that she is able to provide legendary customer service on her flights because her scores are consistently above both the base and system average." (ECF No. 33-20, PageID.637.) "However," Gunn added, "because she was unable to perform her duties as a purser when we needed her the most due to a last minute sick out, I recommend issuing Maria a Written Coaching. . . . Although a written coaching will remove Maria from the Purser Program, it will send a clear message that it is unacceptable to call in for a trip at the last moment, and allow her to ability to be [sic] reinstated into the purser program in 18 months." (ECF No. 33-20, PageID.637.) In addition to Gunn and McGlone, Courtney Ebert, a human resources manager, was involved in deciding Stang's "performance development" (a generic term Delta uses for written coaching and other forms of employee discipline). (*See* ECF No. 33-6, PageID.454, 486–487.)

The written coaching that Gunn drafted is a bit ambiguous. Although the subject line of the coaching stated, "Company Policy Violation—Absence Notification," the work rule Gunn referenced in the body of the letter corresponds to a "trip refusal." (*See* ECF No. 33-25, PageID.744.) The absence-notification rule and the trip-refusal rule are different. The trip-refusal rule states, "Once you have an assignment by bid, pick-up, . . . or drafting, refusing the assignment could result in performance development up to and including termination of employment." (ECF No. 33-11, PageID.612.) In contrast, the relevant absence-notification rule states, "You must notify

the Management Support Team . . . as soon as you are aware of your inability to cover an assignment . . . . You must call 3 hours prior to scheduled report time. If you call in less than 3 hours prior to report time, your schedule will be marked CFSM [contact your flight service manager] and you may be subject to performance development." (ECF No. 33-10, PageID.606.) In addition to the rules being different, violating the rules leads to different discipline. A "trip refusal" can result in a "corrective action notice," a more serious form of performance development than written coaching. (ECF No. 33-8, PageID.585; ECF No. 33-9, PageID.600.) Further, unless a trip refusal is excused, it counts as an "accountable absence"; and accountable absences negatively affect a flight attendant's "reliability" record. (ECF No. 33-6, PageID.497–500; ECF No. 33-8, PageID.585.) In contrast, violating the absence-notification rule does not affect the attendant's reliability record. (ECF No. 33-6, PageID.472–473, 488.)

It appears that the written coaching Gunn drafted is a bit ambiguous because Stang was initially investigated for a trip refusal but ultimately found to have violated the absence-notification rule. (ECF No. 33-6, PageID.470; ECF No. 33-8, PageID.577.) Gunn later explained that Stang was not given a trip refusal "because the absence was approved by Sedgwick." (ECF No. 33-8, PageID.576.) McGlone recalled, "I guess based on reviewing [Stang's] performance background, reviewing that possibly FMLA had been approved, the outcome of [Stang's] performance development became a written coaching which is substantially lower [than a corrective action notice]." (ECF No. 37-1, PageID.845.) And Ebert recalled, "So because of [Stang's] good record, I think [Gunn] made the decision to err on the side of the employee and issue a written coaching in lieu of [a corrective action notice], and I'd like to be able to support leaders when they make those types of recommendations, and it was very sound reasoning." (ECF No. 33-6, PageID.487.)

7

On October 7, 2015, Gunn provided Stang with her written coaching. He also met with Stang in person to review it. (*See* ECF No. 33-2, PageID.404.) The primary consequence of Stang's written coaching was that she was removed from the purser program for 18 months. (ECF No. 33-25, PageID.744.) At the bottom of the written coaching, Stang was informed, "If you would like to appeal this performance development, the Conflict Resolution Process (CRP) may be the avenue to explore. Some cases are not CRP eligible, so please contact the CRP Gatekeeper at crp.ifs@delta.com for more information." (ECF No. 33-25, PageID.744.) In addition, when they met to review the written coaching, Gunn printed out information regarding the CRP process and provided it to Stang. (ECF No. 33-2, PageID.404.)

On the same day that Stang received her performance development, Berichon also received a performance development for not accepting the purser position on the Amsterdam flight. Berichon's performance development was imposed by a different flight service manager than Gunn. (ECF No. 33-14, PageID.621.) And Berichon's discipline was more severe than Stang's: she received a trip refusal (instead of an absence-notification violation) and a corrective action notice (instead of written coaching). (ECF No. 33-14, PageID.621.) As a result, Berichon was suspended from the purser program for 24 months. (*Id.*) And for six months, she needed to substantiate any absence due to illness with a physician's note. (*Id.*)

### 3.

Both Berichon and Stang sought review of their performance developments.

Berichon chose to use the conflict resolution process. (*See* ECF No. 33-15, PageID.624.) Apparently, McGlone (the base manager involved in Stang's performance development) advised Berichon to use the CRP. (*See id.*) And while McGlone's memory of Berichon's appeal had faded considerably, she stated, "I do remember I may have spoke to our local leadership about Amy

[Berichon] on her behalf based on her past performance and that we should just review it. But Amy's leader did not report to me so I did not have any influence or I did not have the ability to change her performance development." (ECF No. 37-1, PageID.828.) It also appears that after receiving the corrective action notice, Sedgwick approved Berichon for FMLA leave for the day of the Amsterdam flight. (ECF No. 33-2, PageID.411–412.) Perhaps in part because of the FMLA approval, and perhaps in part because of McGlone, and perhaps for other reasons, Susan Judson, a managing director, removed Berichon's corrective action as part of the CRP. (ECF No. 33-6, PageID.493.) Ultimately, Berichon was not given any performance development for refusing the purser position on the Amsterdam flight. (*See* ECF No. 33-2, PageID.411–412; ECF No. 33-6, PageID.508–509.)

In addition to the CRP, Delta had two other ways to appeal performance development. One was an "open door" policy. Ebert (the HR manager who worked on both Stang's and Berichon's cases) explained, "there's also the open-door process that is available to all employees, where an employee can reach out to leaders, begin at their local level and work all the way up to the CEO, if they are so inclined, to appeal their performance development." (ECF No. 33-6, PageID.501.)

It appears that Stang invoked this open-door method of appealing her written coaching. Stang twice went to Gunn. Stang recalls, "I said [to Gunn], 'I think this . . . written warning, for all my years of service and never being in trouble, was extreme, and I wanted to do something about it.' And . . . he wasn't very helpful, and he said I was lucky I had a job." (ECF No. 33-2, PageID.408.) Stang went back to Gunn a second time with similar results: "I was very frustrated, and so I went back again to him and I said, 'I really need to talk to you about this. . . . I really want to proceed with this.' And . . . then it just kind of fell dead." (ECF No. 33-2, PageID.408; *see also id.* PageID.411 ("I went and talked to Christian, and I just felt very discouraged and pretty much

9

told be thankful I got what I got.").) Stang also recalls reaching out to McGlone. "I saw her in the hall one time, and I said, . . . [']I shouldn't have come to work today.['] [A]nd I kind of got the . . . runaround from her, and I just kind of—I just kind of gave up." (ECF No. 33-2, PageID.409.)

In March 2016—over six months after the Amsterdam flight—Stang wrote a letter to Delta Corporate Director Ravindra Dadhich. In the letter, Stang stated that she received FMLA coverage for the day of the missed flight, that it was her understanding that an employee should not be disciplined for an absence covered by the FMLA, that she was sorry for the disruption caused by her unforeseen absence, and that she was requesting reinstatement to the purser program. (ECF No. 33-26, PageID.746.) Dadhich eventually called Stang and informed her that because her notice was within three hours of her reporting time, her discipline would stand. (ECF No. 33-2, PageID.424–425.) According to Stang, at this point, "I let it go. I let it go." (ECF No. 33-2, PageID.425.)

## C.

But, apparently, only for a time. In October 2018—nearly three years after she was given the written coaching and well after her 18-month purser suspension had expired—Stang filed this lawsuit. Stang's amended complaint contains two counts: Delta interfered with rights provided to her by the Family Medical Leave Act, and Delta retaliated against her for exercising rights under the FMLA. (ECF No. 19.)

Delta seeks to end this case via summary judgment. (ECF No. 33.) In response to Delta's motion, Stang has agreed to "withdraw[]" her interference claim "without prejudice." (ECF No. 37, PageID.797.) Although the Court does not accept the "without prejudice" qualification (more on why later), for now it suffices that the interference claim is "withdrawn." Remaining for adjudication then is Stang's retaliation claim under the FMLA.

## II.

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

## III.

The Court begins with selecting the right framework to analyze Stang's claim of FMLA retaliation at the summary-judgment stage. The Court then turns to applying that framework. At the end of this opinion, the Court briefly addresses two other issues raised by the parties.

### A.

The Family Medical Leave Act grants qualifying employees certain substantive rights and prohibits an employer from retaliating when an employee exercises those rights. More specifically, the FMLA "entitles qualifying employees to up to twelve weeks of unpaid leave each year if, among other things, an employee has a serious health condition that makes the employee unable to perform the functions of the position of such employee." *Edgar v. JAC Prod.*, Inc., 443 F.3d 501, 506 (6th Cir. 2006) (internal quotation marks omitted). To help secure this right, the FMLA prohibits an employer from retaliating against an employee for taking FMLA leave. *See* 29 U.S.C. § 2615(a)(2). In fact, an employee's use of FMLA leave cannot even be "a negative factor" in an employer's decision making. *See* 29 C.F.R. § 825.220(c); *Grubb v. YSK Corp.*, 401 F. App'x 104, 109 (6th Cir. 2010).

At the summary-judgment stage, a few different frameworks are used to analyze a claim that an employer unlawfully retaliated under the FMLA.

Selecting the proper framework depends in part on whether the employee offers "direct" or "indirect" evidence of retaliation. *Demyanovich v. Cadon Plating & Coatings, L.L.C.*, 747 F.3d

11

419, 432 (6th Cir. 2014). "Direct evidence does not require a factfinder to draw any inferences in order to conclude that the challenged employment action was motivated at least in part by" retaliation for protected conduct. *See id.* (alterations and internal quotation marks omitted). Where the employee offers direct evidence of retaliation, courts do not use the *McDonnell Douglas* framework to address the retaliation claim. *See id.*; *Brown v. Excelda Mfg. Co., Inc.*, 726 F. App'x 445, 447 (6th Cir. 2018).

Stang has pointed to no evidence that would allow a jury to find retaliation without drawing inferences. Stang, for example, has not identified any statement by any Delta employee that they were upset about Stang requesting or receiving FMLA leave. *See Tilley v. Kalamazoo Cty. Rd. Comm'n*, 654 F. App'x 675, 683 (6th Cir. 2016) (finding no direct evidence where termination letter did not indicate that employee's use of FMLA leave motivated the termination); *cf. Demyanovich*, 747 F.3d at 432 (finding direct evidence where, immediately after employee requested FMLA leave, employee's supervisor told employee that he was a "liability" and terminated him shortly thereafter). Thus, the Court finds that Stang has sought to establish her retaliation claim with indirect evidence.

Moreover, Stang has pursued a single-motive theory of retaliation. This is apparent by her application of the *McDonnell Douglas* burden-shifting framework (*see* ECF No. 37, PageID.794– 797)—a framework that applies only when an employee pursues a single-motive, FMLA retaliation claim. *Compare Hunter v. Valley View Loc. Sch.*, 579 F.3d 688, 692 (6th Cir. 2009) (*Price-Waterhouse* framework), *with Seeger v. Cincinnati Bell Tel. Co., LLC*, 681 F.3d 274, 283 (6th Cir. 2012) (*McDonnell Douglas* framework). So the Court will apply this framework to analyze Stang's FMLA retaliation claim. *Seeger*, 681 F.3d at 283.

**B.**

The *McDonnell Douglas* method of analyzing a claim of retaliation has three steps. At step one, the employee must establish a prima facie case of retaliation. *See Marshall v. The Rawlings Co. LLC*, 854 F.3d 368, 379 (6th Cir. 2017). If she succeeds, that gives rise to a presumption of retaliation and shifts the burden of production (but not persuasion) to her employer. *See Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 142 (2000). To carry its burden of production, the employer must produce evidence of a non-retaliatory reason for the adverse employment action. *See Marshall*, 854 F.3d at 379. If the employer carries its burden of production, then the presumption from the prima facie case vanishes. *See Reeves*, 530 U.S. at 142 (providing, where employer met its burden of production, "the *McDonnell Douglas* framework—with its presumptions and burdens—disappeared, and the sole remaining issue was discrimination [or not]" (internal quotation marks omitted)). Although the presumption falls away, an employee "must be afforded the opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for [retaliation]." *Reeves*, 530 U.S. at 143; *see also Marshall*, 854 F.3d at 379.

**1.**

"To establish a prima facie case of retaliation under the FMLA," Stang must show that (1) she was engaged in activity protected by the FMLA (such as taking FMLA leave); (2) Delta knew that she engaged in the protected activity; (3) she "suffered an adverse employment action"; and (4) "a causal connection existed between the protected FMLA activity and the adverse employment action." *Seeger v. Cincinnati Bell Tel. Co., LLC*, 681 F.3d 274, 283 (6th Cir. 2012).

For the reasons set out below in the context of pretext, the Court doubts that Stang can establish the causal element of her prima facie case. But "[t]he burden of proof at the prima facie

13

stage is minimal; all the plaintiff must do is put forth some credible evidence that enables the court to deduce that there is a causal connection between the retaliatory action and the protected activity." *Seeger*, 681 F.3d at 283. Moreover, because the Court ultimately concludes that a reasonable jury could not find that Delta retaliated, the Court can assume without deciding that Stang has produced evidence establishing a prima facie case of FMLA retaliation. *See e.g., Williams v. AT&T Mobility Servs. LLC*, 847 F.3d 384, 396 (6th Cir. 2017) ("[W]e will assume without deciding that Williams established her prima facie case.").

## 2.

At the second step of the *McDonnell Douglas* framework, the employer must produce evidence that would permit a reasonable jury to find that it took the adverse employment action for a non-retaliatory reason. *See Reeves*, 530 U.S. at 142.

In its brief, Delta says that it issued the written coaching and suspended Stang from the purser program because she violated the absence-notification rule, i.e., she told Delta that she was too sick to fill the purser position on the Amsterdam flight less than three hours before her report time. (ECF No. 33, PageID.248–249.)

Delta has carried its burden. The subject of Stang's written coaching is "Company Policy Violation—Absence Notification." True, the body of the letter recites the trip-refusal rule. (*See* ECF No. 33-25, PageID.744.) But other evidence plainly shows that Stang's performance development was for her violation of the absence-notification rule. To start, a printout of Stang's absences shows that her refusal to take the Amsterdam flight was deemed non-accountable—it did not affect her reliability score. (ECF No. 33-24, PageID.710; ECF No. 33-8, PageID.573–574.) And each of the Delta employees involved in issuing Stang the performance development—Gunn (Stang's supervisor), McGlone (base director), and Ebert (HR manager)—testified that the

14

performance development was for Stang's failure to comply with the absence-notification rule. (ECF No. 33-8, PageID.557 (Gunn); ECF No. 37-1, PageID.811–812 (McGlone); ECF No. 33-6, PageID.458, 470–471 (Ebert).)

In short, Delta has carried its burden of production; it has produced evidence from which a jury could find that Stang's performance development was based on her violation of the absence-notification rule and not her FMLA leave.

### 3.

At this final step of the *McDonnell Douglas* framework, courts usually focus on whether the employee has produced evidence that would permit a reasonable jury to find that the employer's allegedly non-retaliatory reason for the adverse action is, in fact, a pretext for retaliation. But the Court is mindful that "[t]he ultimate [summary judgment] question is whether the employer intentionally discriminated." *Reeves*, 530 U.S. at 146. In other words, in an FMLA retaliation case, taking the record as a whole, could a reasonable jury find that the employer retaliated for the employee's protected conduct? *Id.* at 148 ("[W]e have reiterated that trial courts should not treat discrimination differently from other ultimate questions of fact." (internal quotation marks omitted)); *Jackson v. VHS Detroit Receiving Hosp., Inc.*, 814 F.3d 769, 776, 779 (6th Cir. 2016) (providing that "courts should not allow [the] burden-shifting analysis to obfuscate the appropriate question—whether there exists a genuine issue of material fact" and that "in evaluating pretext and the plaintiff's ultimate burden, the court should consider all probative evidence in the light most favorable to the plaintiff." (original alterations and internal quotation marks omitted)); *Campo v. Slater*, 128 F. App'x 173, 174 (2d Cir. 2005) ("We have noted that the third step in the burden-shifting analysis mandates a case-by-case approach, with a court examining the entire record to determine whether the plaintiff could satisfy his [or her] ultimate

burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff." (internal quotation marks omitted)). Indeed, "there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory." *Reeves*, 530 U.S. at 148; *see also St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993). Thus, while the Court does address Stang's claims of pretext below, it is worthwhile to first explain why no reasonable jury could find retaliation.

Start with timing. On September 22—before Stang had been approved for FMLA leave—Gunn authored a memo to McGlone recommending that Stang receive a written coaching and an 18-month suspension from the purser program. (ECF No. 33-20, PageID.637.) This is the exact performance development that Stang would ultimately receive. In other words, Gunn had recommended Stang's discipline before Stang had been approved for FMLA leave. That timing cuts against the notion that Gunn formulated his discipline because he was upset about Stang's use of FMLA leave.

To be sure, Stang *requested* FMLA leave before Gunn's September 22 memo. But even refocusing on the request does not help Stang establish a retaliatory motive. This is because it was Gunn who recommend to Stang that she contact Sedgwick, and it was Gunn who followed up with Stang to make sure she had done so. (ECF No. 33-18, PageID.632; ECF No. 33-20, PageID.636.) Indeed, Stang testified that Gunn "told [her] to bring in FMLA paperwork" and to contact Sedgwick. (ECF No. 33-2, PageID.331; *see also* ECF No. 33-2, PageID.344 ("I went to my doctor and I called Sedgwick. . . . I know I got the FMLA paperwork; and, if I recall, Christian [Gunn] told me to do that.").) In other words, rather than being hostile to Stang requesting FMLA leave, Gunn encouraged it.

Still more evidence cuts against Stang's claim of retaliation. In particular, Gunn, McGlone, and Ebert all testified that the basis for the performance development was Stang's violation of the absence-notification policy. (ECF No. 33-6, PageID.458, 470–471; ECF No. 33-8, PageID.557; ECF No. 37-1, PageID.811–812.) And discipline for violating the absence-notification policy is, obviously, not discipline for exercising rights under the FMLA.

In all, the record contains scant evidence that Stang's exercise of her FMLA rights had anything to do with the performance development she received.

Stang disagrees with this conclusion. And she offers several reasons that, in her view, show that the absence-notification violation is merely a pretext for retaliation or show that Delta had a motive to retaliate.

For one, Stang argues that temporal proximity supports her claim of retaliation. But as already discussed, Gunn had recommended a written coaching and a purser-program suspension before Stang had been approved for FMLA leave. In any event, "temporal proximity is insufficient in and of itself to establish that the employer's nondiscriminatory reason for [disciplining] an employee was in fact pretextual." *Robinson v. MGM Grand Detroit, LLC*, 821 F. App'x 522, 530 (6th Cir. 2020) (quoting *Skrjanc v. Great Lakes Power Serv. Co.*, 272 F.3d 309, 317 (6th Cir. 2001)).

Stang also says it "made no sense" for Delta to issue her a performance development "when she had a legitimate medical issue." (ECF No. 37, PageID.795.) In support of this assertion, Stang points out that Gunn testified that even if an employee had a heart attack within the three-hour window, the employee would still have violated the absence-notification rule if she called in sick. (ECF No. 37, PageID.795; *see also* ECF No. 33-8, PageID.586.) This is nonsensical, says Stang. (*See* ECF No. 37, PageID.795.) And Stang believes that Gunn's testimony is inconsistent with the

testimony of a Sedgwick employee who is the "team lead on the Delta FMLA Account." (*See* ECF No. 33-23, PageID.652; ECF No. 37, PageID.790, 795.) The Sedgwick employee testified that she had never heard a Delta flight service manager inform an employee who had been granted FMLA leave that she could still be disciplined under the absence-notification policy. (*See* ECF No. 33-23, PageID.677.) Stang also refers the Court to the testimony of her friend, Benda, who recalled a situation where a flight attendant was vomiting inside the three-hour window and was not disciplined for an absence-notification violation. (ECF No. 37, PageID.791, 795.)

Stang's brief does not make clear what the upshot of all this evidence is. (*See* ECF No. 37, PageID.794–795.) But Stang has made clear that her condition worsened as the day of the Amsterdam flight wore on and that purser work is more demanding than flight-attendant work. So, apparently, Stang believes she is like the attendant who suffered a heart attack or the one that vomited: she first became too sick to work (or, at least, work as a purser) inside the three-hour window and thus, could not have provided earlier notice. Thus, Stang apparently maintains that there was no valid basis to discipline her for an absence-notification violation and, as such, Delta's reason for her performance development is pretextual.

No reasonable jury would be persuaded. It appears that Delta considers the circumstances of each case in deciding whether an attendant violated the absence-notification rule or, at least, in deciding whether to discipline an employee for violating that rule. (*See* ECF No. 33-6, PageID.462, 495.) Indeed, the fact that Stang was given a "CFSM" (contact flight service manager) and Gunn then conducted an investigation suggests that Delta examines the circumstances of each case in formulating discipline. And the fact that Berichon ultimately did not receive any discipline for her trip refusal further suggests that Delta considers the attendant's particular circumstances. And Ebert's testimony suggests that too: "We look at this on a case-by-case basis, we look at the

18

facts[.]" (ECF No. 33-6, PageID.482.) And in Stang's particular case, Delta could reasonably think that a flight attendant who checked in and attended a pre-flight briefing inside the three-hour window is different from someone who his vomiting or having a heart attack within the three-hour window. (ECF No. 33-6, PageID.464 ("[Stang] was initially representing to the company, by signing in, reporting to briefing, that she was fit for duty, able to work as a flight attendant."); (ECF No. 37-1, PageID.839 (similar).) So while it might make no sense to find that the vomiting or cardiac attendant violated the absence-notification rule, it might well make sense to find that Stang did.

But even granting that Delta was wrong to discipline Stang for violating the absence-notification rule because she was already within the three-hour window when she became too sick to work, the question is not merely whether her performance development lacked a valid basis. Instead, the question is whether the true reason for her discipline was retaliation for exercising her FMLA rights. *Robinson v. MGM Grand Detroit, LLC*, 821 F. App'x 522, 529–30 (6th Cir. 2020) ("[A] reason cannot . . . be a pretext for [retaliation] unless it is shown both that the reason was false, and that [retaliation] was the real reason." (alterations in original) (quoting *Seeger*, 681 F.3d at 285)). As explained, Stang has virtually no evidence that Delta gave her a performance development because she requested or used FMLA leave. From Gunn to McGlone to Ebert to Dadhich, each believed that Stang's violation of the absence-notification rule was the reason for the written coaching and purser-program suspension. (ECF No. 33-8, PageID.562, 574 (Gunn); ECF No. 37-1, PageID.811–812, 834 (McGlone); ECF No. 33-6, PageID.458, 470–471 (Ebert); ECF No. 33-2, PageID.424–425 ("[Dadhich] said that, unfortunately, the disciplinary measures would have to stand. . . . [b]ecause it was under three hours.").)

19

Stang next attempts to establish pretext or a retaliatory motive by arguing that when she approached Gunn, he discouraged her from challenging her performance development. (ECF No. 37, PageID.796.) According to Stang, when she approached Gunn about appealing the written coaching, Gunn said that she was "lucky [she] had a job" and that she should be "thankful [she] got what [she] got." (ECF No. 33-2, PageID.408, 411.)

The fact that Gunn was dismissive of Stang's requests to challenge her performance development at most weakly shows pretext or a retaliatory motive. First off, it was Gunn who told Stang to contact Sedgwick, and Stang recalls Gunn telling her to bring FMLA paperwork. (ECF No. 33-2, PageID.331, 344.) That Gunn essentially encouraged Stang to seek approval for FMLA leave cuts against the notion that FMLA leave had anything to do with Gunn discouraging Stang's appeal. Additionally, the record provides a non-retaliatory reason for Gunn telling Stang that she was "lucky [she] had a job" and that she should be "thankful [she] got what [she] got." Initially a trip refusal was on the table, but Gunn decided to give Stang a lighter penalty. Gunn says that he did not give Stang a trip refusal because her absence was approved by Sedgwick (ECF No. 33-8, PageID.576); in addition, his written coaching shows that he was not recommending a trip refusal in light of Stang's 30-year record at Delta (ECF No. 33-20, PageID.637). And Ebert, the HR manager, testified, "because of [Stang's] good record, I think [Gunn] made the decision to err on the side of the employee and issue a written coaching in lieu of [a trip refusal], and I'd like to be able to support leaders when they make those types of recommendations, and it was very sound reasoning." (ECF No. 33-6, PageID.487.) Given that Gunn directed Stang to Sedgwick and that Gunn exercised his discretion to recommend a lower level of discipline, his dismissive attitude toward an appeal does not suggest a motive to retaliate for Stang's exercise of FMLA rights.

Finally, Stang says that Delta's handling of Berichon's situation is evidence that the absence-notification violation is pretext for retaliation or evidence of a retaliatory motive. (ECF No. 37, PageID.796.) Recall that Stang and Berichon both refused the purser position on the Amsterdam flight due to illness and both did so within the three-hour window. And both were initially written up. But Stang ultimately received performance development and Berichon ultimately did not. According to Stang, a "jury must evaluate the full record and decide whether Delta's articulated reasons for leniency for Berichon compared to [her] were Delta's true motivations." (ECF No. 37, PageID.796.)

The fact that Berichon and Stang engaged in similar conduct but ultimately received different discipline does not tend to show that Delta was motivated to retaliate against Stang for her exercise of FMLA rights. As an initial matter, it appears that Berichon, like Stang, was approved for FMLA leave for the day of the Amsterdam flight. (ECF No. 33-2, PageID.411–412.) So if Stang's use of FMLA leave motivated a performance development, why wouldn't Berichon's use of FMLA leave have motivated a performance development? And even if Berichon was not granted FMLA leave for the day of the flight, Stang and Berichon's methods of appealing their performance developments were different. Berichon followed the more-formal conflict resolution process and ultimately had her performance development removed by Judson. Although Gunn printed out a copy of the CRP for Stang (and her written coaching referenced it too), Stang elected to follow Delta's open-door route to appeal. And along that route she never contacted Judson. In other words, Stang and Berichon used different methods to challenge their performance developments and reached out to different decisionmakers. These differences in methods and decisionmakers provide a reason unrelated to the FMLA for the difference in Stang and Berichon's

21

discipline. Thus, Delta's different treatment of Stang and Berichon does not give rise to a reasonable inference that Delta retaliated against Stang for the use of FMLA rights.

* * *

In sum, assuming that Stang has established a prima facie case of FMLA retaliation, Delta has produced evidence that it disciplined Stang for a reason unrelated to Stang's exercise of FMLA rights and no reasonable jury could find Delta's reason to be a pretext for retaliation. As for the ultimate summary-judgment question, taking the record as a whole, no reasonable jury could find that Delta retaliated because Stang exercised rights under the FMLA.

## C.

That almost resolves this case save for two issues raised in the parties' summary-judgment briefs.

As noted at the outset, Stang has "respectfully withdraw[n] her claim for FMLA interference without prejudice." (ECF No. 37, PageID.797.) While the Court deems the claim withdrawn, it deems it withdrawn with prejudice for at least two reasons. First, Delta's opening summary-judgment brief argued that no reasonable jury could find for Stang on her FMLA-interference claim. And only in responding to Delta's motion, did Stang withdraw her claim. It would be unfair to Delta to allow Stang to revive her FMLA interference claim in another case when Stang has already had the opportunity to conduct discovery on the claim and respond to Delta's arguments in this case. A second case would also be a poor use of judicial resources. Secondly, Delta issued Stang a performance development in October 2015 and so her suspension was over by May 2017. At most Stang had three years to file an FMLA-interference claim. It is now March 2021. So any future FMLA-interference claim brought by Stang for her October 2015 performance development would in all likelihood be too late.

And that is a good segue to the second loose end. Delta has argued that Stang's FMLA claims were brought too late even in this case. (ECF No. 33, PageID.242.) Delta points out that the FMLA has a two-year statute of limitations unless it willfully violated the FMLA, in which case the statute of limitations is three years. (*Id.*) Yet, argues Delta, Stang does not have evidence from which a reasonable jury could find that it willfully violated the FMLA. (ECF No. 33, PageID.243.) Given that this case was filed in October 2018, but Stang's written coaching was in October 2015, Delta concludes that Stang waited too long to seek relief under the FMLA. (*Id.*) Because the Court finds that a reasonable jury could not find that Delta retaliated in violation of the FMLA, and because the Court finds that Stang's FMLA-interference claim is withdrawn with prejudice, the Court does not address Delta's statute-of-limitations argument.

## IV.

For the reasons given, Delta's motion for summary judgment (ECF No. 33) is GRANTED. This case is DISMISSED WITH PREJUDICE and a separate judgment will follow.

SO ORDERED.

Dated: March 25, 2021

s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES DISTRICT JUDGE